No. 23,544.

ELLA STOVER, as an Individual and as Guardian, etc., *Appellee*, v. JAMES DAVIS and J. A. AYLWARD, as Copartners, etc., *Appellants*, et al.

### SYLLABUS BY THE COURT.

MASTER AND SERVANT—*Injured Workman Not Within Provisions of Workmen's Compensation Act.* The proceedings in an action for compensation considered, and *held*, the workmen's compensation act did not apply to the injured workmen's employers, whose business was drilling oil wells, because they had not employed five or more workmen continuously for more than one month at the time of the accident. (Gen. Stat. 1915, § 5902.)

Appeal from Butler district court; ALLISON T. AYRES, judge. Opinion filed March 11, 1922. Reversed.

*G. P. Aikman, C. L. Aikman, A. L. L. Hamilton,* and *J. B. McKay,* all of El Dorado, for the appellants.

*J. M. Pleasant, T. A. Kramer,* and *George J. Benson,* all of El Dorado, for the appellees.

The opinion of the court was delivered by

BURCH, J.: The action was one for compensation for death of the plaintiff's husband. The plaintiff recovered, and the defendants appeal.

The defendants, Davis and Aylward, are partners in the business of drilling oil and gas wells. At the time of the accident they were engaged in drilling an oil well for the Ramsey Petroleum Company, on a farm near El Dorado. The plaintiff's husband, John Stover, was one of the defendants' drillers, and worked from midnight to noon. On the night of November 29, 1917, a casing crew was pulling casing, and encountered a "frozen" joint of ten-inch casing. Four members of the crew were pushing on the casing pole, and Stover and the tool dresser, who were assisting the casing crew, were pulling. Stover released his grasp of the pole, put his hand to the

right side of his neck, said he was hurt, stepped aside, and sat down. This occurred about 11:30 p. m. Stover went home, his wife bathed his neck with liniment, and he went to bed without eating anything. The next morning he appeared to be in pain, would put his hand to the right side of his neck, and ate but little, but he went to work at noon. That night when he came home his wife bathed his neck, and when he got warm he went to bed. During the day he had worked as usual. In the forenoon of December 1, he arranged to purchase some stock in the petroleum company, and then, because he was late, expressed anxiety to get to the well, which had been drilled to the oil sand. When he came on duty, about 1 p. m., he operated the bailer for a time, and then, together with the defendant Davis, washed some of the sand. They were drilling in, and had reached the point where the character of the well would soon be revealed. Stover was very much interested, and exhibited some excitement. A witness testified as follows:

"I saw him leave the rig with Davis to wash some sand. They went back of the engine house; Stover was stirring the sand, he was stooped over, and when he raised up he just went around and sat down on the tool rack. He said, 'My God, my head hurts me,' and put his hand up there. Somebody asked him if he got hurt, and he said 'no,' but he complained of his head hurting. Four or five asked him if he got hurt, and he told them all 'no.' Duff and Davis and I brought him to town in my car. He kept complaining of his head, and telling Davis he was going to die. Mrs. Stover came out as we were taking him out of the car, and said, 'John, how did you get hurt,' and he said 'Mamma, I didn't get hurt,' and then we took him out of the car. We got the doctors as soon as possible."

Soon after the doctors arrived, Stover died of apoplexy.

While apoplexy may occur when the subject is at rest or asleep, severe exertion, such as lifting a heavy object, is a direct cause, and, without doubt, the strain incident to Stover's pulling on the casing pole caused a cerebral hemorrhage. The effect of a cerebral hemorrhage depends on the portion of the brain in which it occurs, the amount of blood which escapes, and the rate of extravasation. Death may come quickly. In case of slight lesion and slow hemorrhage, the first symptoms may be of minor severity, and the attack may progress slowly to culmination occurring some days later. During this period the person affected may be able to perform his usual work. Sometimes the blood clot is absorbed, and the patient apparently recovers. Generally the attack is a blow to health, with marked residual physical effect. The patient should be put to bed and kept quiet, physical strain should be avoided, blood pres-

sure should be reduced, and emotional stress should be avoided. In this instance, Stover not only kept at work, but worked under the excitement attending bringing in the well, in which he was financially interested, and the result was inevitable.

The district court found that Stover's death resulted from personal injury by accident arising out of his employment. Approval of the finding would not benefit the plaintiff. Her action must fail, because the workmen's compensation act did not apply to her husband's employment.

The defendant owned five "strings of tools." When all of them were in use, twenty men were regularly employed, two drillers and two tool dressers to each well. The number of outfits continuously in use depended on the number of drilling contracts the defendants were able to obtain. Sometimes their entire equipment was busy, sometimes two or three strings were in use, and sometimes none at all. Whenever a string of tools was shut down, the men who had been operating it were released. For a period of four or five days previous to the casing-pole incident, and for a week or more previous to the sand-washing incident, the defendants had no men employed except the four, including Stover, who were drilling the petroleum company's well. Other work in progress when this well was commenced had been completed and the workmen had been discharged. The pertinent statutes read as follows:

"This act shall apply only to employment in the course of the employer's trade or business on, in or about a railway, factory, mine or quarry, electric, building or engineering work, . . .

" 'Engineering work' means any work in the construction, alteration, extension, repair or demolition of a railway (as hereinbefore defined), bridge, jetty, dyke, dam, reservoir, underground conduit, pole lines constructed or used for carrying conductors, sewer, oil or gas well, . . ." (Laws 1917, ch. 226, §§ 1, 2.)

"It is hereby determined that the necessity for this law and the reason for its enactment, exist only with regard to employers who employ a considerable number of persons. This act, therefore, shall only apply to employers by whom five or more workmen have been (employed) continuously for more than one month at the time of the accident: *Provided, however,* That employers having less than five workmen may elect to come within the provisions of this act in which case his employees shall be included herein, as hereinafter provided: *And provided further,* That this act shall apply to mines without regard to number of workmen employed." (Gen. Stat. 1915, § 5902.)

When applied to the facts disclosed by the evidence, the meaning of the section last quoted is too plain to require interpretation. A

definite minimum number of workmen must have been employed, not intermittently, or part of the time, but continuously for a definite minimum period, computed from the time of the accident. Possibly, under some circumstances, fortuitous interruption affecting number of workmen or continuity of employment may be taken into consideration. Upon that subject the court expresses no opinion. There is no room, however, for interpolating, by process of average, a mean number of workmen or mean time of employment; there is no way of bridging over a clear gap in number of men or continuity of employment; and the statute may not be restated in terms which would make it apply to some usual number of men ordinarily employed most of the time during considerable periods when business was fairly good. In this instance there is no suggestion of purpose to evade the statute. The accident was not anticipated, and workmen were discharged because the defendants had no work for them to do. Whatever the status of the defendants with reference to the compensation act earlier in November, the public interest and public policy which prompted the statute ceased to be concerned with their business when the number of employees fell below the statutory minimum.

The plaintiff seeks to bring the employment within the terms of the statute by counting the casing crew of five men. This may not be done for two reasons. The casing crew worked but three days, November 29, November 30, and December 1, and the casing crew was not employed by the defendants. When drilling an oil well, the contractor puts in the casing, but it is no part of his business to remove casing when the well approaches completion. For that purpose casing crews are employed and paid by the owner of the well. The drillers supervise the work of pulling casing; the drillers and tool dressers work with the casing crew, and the contractor is paid by the owner for use of his tools and men while drilling operations are suspended. In this instance the defendants were paid $60 per day while the casing crew was at work. In practice, the owner of the well tells the contractor what casing he desires pulled. The contractor speaks to the manager or foreman of some casing crew, who brings his men, keeps account of their time, renders his bill to the owner, collects the sum due, and pays his men.

The defendants' workmen were taken from the city of El Dorado, where they resided, to the site of the well, and from the well to the city, by a taxicab driver who made two trips per day, one at noon

and one at midnight. The plaintiff insists that the taxicab driver should be counted as one of the defendants' workmen. In its relation to the present controversy, application of the statute of 1917, quoted above, is limited to employment in the course of the employer's business on, in or about engineering work, embracing construction of an oil well. Workmen affected by the act are workmen exposed to the peculiar hazards of the locality (*Bevard v. Coal Co.*, 101 Kan. 207, 165 Pac. 657; *Hicks v. Swift & Co.*, 101 Kan. 760, 168 Pac. 905), and in ascertaining the number of workmen necessary to bring an employer's business within the statute, none are to be counted except those exposed to the hazards of the locality (*Udey v. City of Winfield*, 97 Kan. 279, 155 Pac. 43.) It seems quite clear the El Dorado taxicab driver was engaged in the transportation business, and not in engineering work on the farm where the well was located.

The judgment of the district court is reversed, and the cause is remanded with direction to enter judgment for the defendants.